UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANTONIO M. BOGAN, | ) |
| Plaintiff, | ) 14 C 7849 |
| vs. | ) Judge Gary Feinerman |
| DETECTIVE JEFFREY GERMAN, DETECTIVE SERGEANT BROWN, OFFICER JOHN BYRNE, OFFICER PETER VAN GESSEL, SERGEANT LARRY COLLINS, OFFICER ROBERTSON, OFFICER CHRISTOPHER DELANEY, OFFICER FRANK E. WASCHER, JR., and OFFICER BUSSEY, | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Antonio Bogan brought this *pro se* suit under 42 U.S.C. § 1983, alleging numerous claims arising from his July 2013 arrest. Docs. 1, 119. The claims against several defendants have been dismissed, one involuntarily and the rest voluntarily. Docs. 106, 217-218. The only remaining claims arise under the Fourth Amendment and are brought against several members of the Joliet Police Department based on search of his apartment and on the detention and search of his automobile. The parties have cross-moved for summary judgment on those claims. Docs. 177, 185. Bogan's motion is denied, and Defendants' motion is granted.

**Background**

As the parties have cross-moved for summary judgment, the court ordinarily would view the facts in the light most favorable to Bogan when considering Defendants' motion and in the light most favorable to Defendants when considering Bogan's motion. *See First State Bank of Monticello v. Ohio Cas. Ins. Co.,* 555 F.3d 564, 567 (7th Cir. 2009) ("[B]ecause the district court

1

had cross-motions for summary judgment before it, we construe all facts and inferences therefrom in favor of the party against whom the motion under consideration is made.") (internal quotation marks omitted). But because the court will grant summary judgment to Defendants, the facts are set forth in the light most favorable to Bogan. *See Garofalo v. Vill. of Hazel Crest*, 754 F.3d 428, 430 (7th Cir. 2014). The court assumes the truth of those facts for purposes of summary judgment, but does not vouch for them. *See Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015).

    A.    **Bogan's Arrest and the Search of His Apartment**

On July 27, 2013, Bogan—who at the time rented Unit 103 at 1911 Moore Avenue in the Pheasant Run apartment complex in Joliet, Illinois—was arrested on the lawn outside his apartment building. Doc. 186 at ¶¶ 3-4. At that time, Bogan was serving a term of mandatory supervised release ("MSR"), a variant of parole, arising from a state court conviction. *Id*. at ¶¶ 20-21. As a condition of his MSR, Bogan had signed an MSR Agreement requiring him during his MSR term to consent to searches of his person or property or residence under his control. *Id*. at ¶ 20. Our remaining defendants—Detective Jeffrey German, Detective Sergeant Brown, Officer John Byrne, Officer Peter Van Gessel, Sergeant Larry Collins, Officer Robertson, Officer Frank Wascher, Jr., Officer Christopher Delaney, and Officer Busse—were employed by the Joliet Police Department ("JPD"). *Id*. at ¶ 1.

Less than twelve hours earlier, Dorie Merino reported to the JPD that Bogan had kicked in the front door of her residence and fired a single shot into the hallway. *Id*. at ¶ 5. In an interview with JPD detectives, Merino recounted that approximately one week earlier, Bogan came to her home to demand payment for a heroin debt owed by a former housemate and threatened her with a

2

.22 handgun with a long barrel by pointing the gun at her face and threatening to kill her if the debt was not repaid. *Id*. at ¶ 7. The detectives also spoke with Anthony Alvarez, who was staying at Merino's home. *Id*. at ¶ 9. According to Alvarez, Bogan kicked in the front door in the early morning hours and fired one shot into the hallway. *Ibid*. An evidence technician recovered a spent .40 caliber shell casing from an entry hole in the hallway of Merino's residence. *Id*. at ¶ 10.

Based on the statements from Merino and Alvarez and the physical evidence recovered from the scene, the JPD circulated an intelligence bulletin stating that probable cause supported Bogan's arrest for the home invasion. *Id*. at ¶ 11. Following the bulletin's issuance, Detective German reviewed a report generated from a Law Enforcement Agencies Data System ("LEADS") search, which showed that Bogan was on parole, lived at 1911 Moore Street in Joliet, and was the registered owner of a 2005 Chevrolet Impala and a 1998 Oldsmobile Cutlass Supreme. *Id*. at ¶ 12, 23 (citing Doc. 186-12 ¶¶ at 2, 3, 10). Officer Robertson went to the Pheasant Run apartment complex and saw Bogan's Cutlass parked there. *Id*. at ¶ 13. Officer Robertson told Officer Byrne, who also was at the complex, that the Cutlass was in the parking lot. *Id*. at ¶ 14. Officer Byrne noticed an Impala entering the parking lot, so he followed it and effectuated a traffic stop. *Id*. at ¶ 15. After exiting his squad car, Officer Byrne approached the Impala and removed the key from the ignition so he could determine the identity of the car's occupants. *Id*. at ¶ 16.

Roughly one minute after Officer Byrne stopped the Impala, Officer Collins recognized Bogan, who was outside the apartment building near the Cutlass, and arrested him. *Id*. at ¶ 18. Officers placed Bogan in the rear seat of Officer Alvarez's squad car, which was parked nearby. *Id*. at ¶ 19. Officers Wascher and Busse then entered the apartment building using a key taken from the Impala and positioned themselves in a common hallway near the door of Bogan's

3

apartment. *Id*. at ¶ 22. (Bogan contends that the officers actually entered his apartment at that time. Doc. 202 at ¶ 22. But he concedes that he could not see the officers as he sat outside in the squad car. Doc. 186 at ¶¶ 29-30. "[F]avor toward the nonmoving party [on summary judgment] does not extend to drawing inferences that are supported by only speculation or conjecture." *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015). As Bogan's disagreement with Defendants' evidence-based assertion that the officers initially stationed themselves in a common hallway is not based on evidence, there is no genuine dispute of fact.)

After Bogan was arrested, Detective German drove to the apartment complex. Doc. 186 at ¶ 23. Before he arrived, German was aware of Bogan's parole status and apartment number from having had read Bogan's LEADS report and also from having contacted Bogan's parole officer. *Ibid*. (Bogan's assertion that neither Detective German nor any other JPD officer was aware of his parole status at that time, Doc. 202 at ¶ 23, is discussed below.) When Detective German arrived, he found Bogan in the rear of Sergeant Alvarez's squad car. Bogan told Detective German that the Impala was the vehicle he "normally" drove. Doc. 186 at ¶ 25. At approximately 2:06 p.m., Bogan agreed to allow the officers to search the Impala and his apartment and signed a "Voluntary Authorization to Search Residence." *Id*. at ¶ 26.

Approximately two minutes after Bogan signed the consent form, Officers Wascher and Busse opened an exterior door to the apartment building to allow Detective German and Sergeant Brown to enter. *Id*. at ¶ 27. The four officers proceeded to Bogan's apartment, unlocked the door, and walked in. *Id*. at ¶ 28. From his vantage point in the squad car, Bogan could not see the police enter his apartment. *Id*. at ¶¶ 29-30. When Officers Wascher and Busse were later

4

asked what legal justification led them to enter the Bogan's apartment building, they did not mention Bogan's parole status. Doc. 200 at ¶ 15.

The officers searched Bogan's apartment and did not find any weapons. Doc. 186 at ¶¶ 32-33. Five to ten minutes into the search, however, Officer Wascher found a knotted clear plastic baggie containing 30 white oval pills inscribed with "Watson 853" on one side. *Id*. at ¶ 34. Wascher gave the baggie to Detective German, who searched www.drugs.com using his cellphone and determined the pills were a controlled substance. *Ibid*. The officers looked for any prescription pill bottles or pharmacy paperwork in an effort to determine if the pills had been prescribed, but were unable to find anything of the sort. *Id*. at ¶ 35.

Detective German gave the baggie of pills to Detective Lauer and asked him to inventory them in the evidence log. *Id*. at ¶ 38. When Detective Lauer logged the baggie, he indicated that the pills had been found at 1:56 p.m., which is approximately ten minutes *before* Bogan consented to the search of his apartment. *Id*. at ¶ 39. Based on Detective Lauer's notation of 1:56 p.m., Bogan contends that the officers searched his apartment before he signed the release; this factual dispute is resolved in Bogan's favor.

B.  **The Seizure and Search of the Cutlass**

When the officers finished searching Bogan's apartment, Detective German went outside and spoke with Sergeant Alvarez, who told him that the Cutlass registered to Bogan was parked outside the apartment building. Doc. 186 at ¶ 41; Doc. 176 at ¶ 19. Bogan has submitted an affidavit averring that while he was waiting in the squad car, he used his cellphone to ask his friends to take the Cutlass. Doc. 176 at ¶ 25; Doc. 176-2 at ¶¶ 14, 17-18. The parties dispute whether the officers prevented one of Bogan's friends from driving off with the Cutlass before

Detective German's arrival in the parking lot and whether the officers blocked the Cutlass to prevent its being moved. Doc. 176 at ¶¶ 24-25. This dispute is resolved in Bogan's favor.

Detective German went to the squad car where Bogan was being held, noticed that he had a cellphone, and took it away from him. Doc. 186 at ¶ 43. Detective German then asked Bogan if he owned any other vehicles besides the Impala, and Bogan said no. *Id*. at ¶ 44. In response to further questions from Detective German, Bogan said he had never seen the Cutlass before, did not know who owned it, did not own it himself, and had never been inside it. *Id*. at ¶¶ 45-46. After Detective German revealed that he knew that the Cutlass was registered to Bogan, Bogan admitted that he used to own the Cutlass but had sold it to "Mike Smith" two weeks earlier and had not retained Smith's contact information. *Id*. at ¶¶ 47-48. No officer observed Bogan entering, exiting, or occupying the Cutlass that day. Doc. 176 at ¶ 21. Bogan refused to consent to a search of the Cutlass. *Id*. at ¶ 30.

After Detective German finished questioning Bogan about the Cutlass, he and Sergeant Collins walked over to the Cutlass, looked through the window, and saw a closed garment bag on the back seat. Doc. 186 at ¶ 49. Detective German could not see inside the bag, but noticed that the upward facing side was raised by what appeared to be a long object inside. *Id*. at ¶ 50. At that point, Detective German believed he had probable cause to search the Cutlass for contraband, including illegal weapons and controlled substances, and he told Bogan he intended to obtain a search warrant. *Id*. at ¶ 51. Bogan asserts that Detective German could have had no more than a "hunch" that criminal activity was afoot, Doc. 202 at ¶ 51, but this legal argument does not undermine Defendants' factual assertion about what German's saw and knew.

At approximately 3:00 p.m., Detective German directed Officer Byrne to stand by the Cutlass to secure it and prevent anyone except police personnel from entering it or removing any items. Doc. 186 at ¶ 52. When Detective German responded to Bogan's first set of interrogatories asking for the legal justification for seizing the Cutlass, German did not mention Bogan's parole status, but when German answered a similar question in Bogan's second set of interrogatories, he did mention Bogan's parole status. Doc. 200 at ¶¶ 16-17. Bogan asserts that this discrepancy creates a disputed issue of fact, while Detective German asserts that it was inadvertent and notes that his incident report memorializing the arrest referenced Bogan's parole status. Doc. 205 at ¶ 18. Under these circumstances, Bogan has not genuinely disputed that German relied on Bogan's parole status when seizing and searching the Cutlass. Between the time that Detective German ordered Officer Byrne to secure the Cutlass and the time that he returned to the parking lot with a search warrant, no one attempted to move or enter the Cutlass. Doc. 186 at ¶ 53.

Detective German left the apartment complex shortly after securing the Cutlass and arrived at the police station at roughly 3:30 p.m. *Id*. at ¶ 54. Before applying for a search warrant, he decided to request a K-9 sniff of the Cutlass to obtain additional support for the warrant application. *Id*. at ¶ 55. The watch commander told Detective German that Officer Van Gessel, the only K-9 officer on duty, was engaged on another call. *Id*. at ¶ 56. Detective German then unsuccessfully tried to find another K-9 officer by calling the Will County Sheriff's Office, the Plainfield Police Department, and the Frankfort Police Department. *Id*. at ¶ 57. (Bogan disputes this fact, asserting that Detective German's incident report and search warrant application merely state that German asked Officer Van Gessel and his canine partner to conduct an open air sniff.

7

Doc. 202 at ¶ 56. According to Bogan, the failure to mention efforts to find another K-9 officer casts doubt on Detective German's contention that he did so. Bogan's speculation does not create a factual dispute. *See Dawson*, 803 F.3d at 833.) Detective German also contacted the Will County State's Attorney's Office to discuss the anticipated search warrant application and to process the evidence collected at the apartment complex. Doc. 186 at ¶ 57.

At roughly 4:15 p.m., Detective German called Officer Van Gessel and asked him to go to the Pheasant Run apartment complex and conduct a K-9 sniff search on the Cutlass. *Id*. at ¶ 58. Officer Van Gessel and his canine partner Biaky—who was trained to detect narcotics, not firearms or prescription medication—arrived at 4:48 p.m. and began the sniff around the Cutlass. *Id*. at ¶ 60; Doc. 176 at ¶ 37. Biaky alerted for the presence of narcotics. Doc. 186 at ¶ 61.

Officer Van Gessel told Detective German that Biaky had alerted, so German contacted a prosecutor from the Will County State's Attorney Office, who agreed that there was probable cause to search the Cutlass. *Id*. at ¶ 62. At 6:45 p.m., Will County Circuit Judge Sarah Jones signed a warrant to search the Cutlass for cannabis, controlled substances, drug packaging, and any other evidence of the crimes of unlawful possession of a controlled substance and unlawful possession of cannabis. *Id*. at ¶ 63. At approximately 7:15 p.m., Detective German and other officers executed the warrant and searched the Cutlass. *Id*. at ¶ 64; Doc. 187 at ¶ 46.

Inside the Cutlass, the officers found a red plastic bag containing a small blender with white powdery residue, Dormin sleep-aid pills, a box of sandwich bags, and a digital scale in a box with a razor blade, scissors, a tooth brush, and a pipe cleaner. *Id*. at ¶ 65. They also found several documents bearing Bogan's name, including a tow sheet, a MoneyGram receipt, and a health insurance card. *Ibid*. They also found a hi-point semi-automatic .40 caliber handgun,

four .40 caliber rounds inside a magazine that matched the caliber of the shell casing recovered from the Merino home, a black .22 caliber Ruger semi-automatic handgun, and various ammunition and empty caliber magazines. *Ibid*. The garment bag on the rear seat contained a 5.56 caliber rifle with a scope, a black zippered rifle case with three 30-round magazines, a .223 live rifle round, and a rifle magazine containing 29 live .233 rifle rounds. *Id*. at ¶ 66.

### C. Bogan's State Criminal Proceedings

Bogan was charged with being an armed habitual criminal and defacing a firearm's identification marks. *Id*. at ¶ 67. He was found guilty at a bench trial. *Id*. at ¶ 68. On appeal, Bogan argued that the prosecution had failed to prove beyond a reasonable doubt that he was in control and possession of the Cutlass at the time of his arrest. *Id*. at ¶¶ 69-70. The state appellate court affirmed Bogan's conviction and thirty-year sentence. *People v. Bogan*, 77 N.E.3d 162 (Ill. App. 2017). In so doing, the court observed that Bogan's *pro se* briefs were "cogent and extremely well-argued," *id*. at 170; this court concurs as to his *pro se* submissions in this case.

## Discussion

### I. The Search of Bogan's Apartment

Defendants argue that Bogan's Fourth Amendment claim regarding the apartment search fails because Detective German knew—before the search—that Bogan was a parolee serving an MSR term. Because this argument prevails, there is no need to consider whether Bogan consented to the search before it occurred or whether probable cause supported the search.

"It is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed. And a principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment."

9

*Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (quoting *Welsh v. Wisconsin,* 466 U.S. 740, 748 (1984)). Thus, outside a few "specifically established and well-delineated exceptions," a warrantless search of a person's home is "*per se* unreasonable." *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2451 (2015) (internal quotation marks omitted).

One exception provides that suspicionless, warrantless searches of the persons and property of parolees, given their diminished expectation of privacy, do not offend the Fourth Amendment. In *United States v. Knights*, 534 U.S. 112 (2001), the Supreme Court held that the Fourth Amendment allowed the search of a probationer's apartment if the officer conducting the search had reasonable suspicion. *Id*. at 121. In so holding the Court left open the question whether the search would have been valid even absent reasonable suspicion, based solely on the probationer's status as a probationer. *See id*. at 120 n.6. Five years later, the Court answered that question in the affirmative, holding in *Samson v. California*, 547 U.S. 843 (2006), that the "suspicionless search by a law enforcement officer" of a California parolee does not offend the Fourth Amendment. *Id*. at 847. And in *United States v. White*, 781 F.3d 858 (7th Cir. 2015), the Seventh Circuit held that *Samson* applied with full force to an Illinois parolee given the similarities between parole status in California and Illinois. *See id*. at 862 ("Even if White's agreement to the conditions of parole were not deemed a prospective consent to a warrantless search of his bag, his status as a parolee is the critical factor showing that the search was nonetheless reasonable under the Fourth Amendment."). Thus, the warrantless and (the court will assume) nonconsensual search of Bogan's apartment was reasonable if the officers, at the time of the search, knew that Bogan was on parole and that the apartment was his residence. *See id*. at 863 (emphasizing that the officers "knew [the defendant] was a parolee").

Bogan argues that the officers learned that he was on parole only when his probation officer arrived *after* they had searched his apartment, and therefore that they could not have relied on his parole status when they searched his apartment. Doc. 202 at ¶ 23. (Bogan does not dispute that he was a parolee or that the searched apartment was his residence.) Defendants' contrary position relies on Detective German's affidavit. Doc. 186 at ¶¶ 12, 23, citing Doc. 186-12 at ¶ 2, 3, 10. Detective German avers that he read a LEADS report noting that Bogan was on parole, and that he confirmed Bogan's parole status with his parole officer, *before* traveling to the apartment complex on the day in question. Bogan asserts that Detective German's affidavit "is insufficient to show knowledge of [his] parole status prior to [the parole officer's] appearance" at the complex after the apartment had been searched. Doc. 202 at ¶ 23. In support, Bogan notes that Detective German's incident report, Doc. 186-8, does not specify *when* he learned of Bogan's parole status. Doc. 200 at ¶ 11. Bogan also stresses that parole officer's parole violation report, *id.* at pp. 30-31, does not reflect that Detective German or any other officer contacted him before Bogan's arrest. *Id*. at ¶ 12. Finally, Bogan notes that Officer Kline, one of the officers at the scene, prepared an incident report that did not note that Bogan was a parolee. *Id*. at ¶ 13.

It is true that Detective German's incident report does not indicate when he learned that Bogan was a parolee. However, Detective Gorman's affidavit fills in that gap by averring that he read Bogan's LEADS report the morning of the arrest and then called Bogan's parole officer to confirm his parole status and apartment number before he drove to the apartment complex. Moreover, while neither the parole officer's violation report nor Officer Kline's incident report note that Bogan was a parolee, neither suggests otherwise. Thus, Bogan's personal belief and suspicion that Detective German learned of his parole status after the apartment search is

11

insufficient to create a triable issue of fact. *See Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) ("inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion" where the record contains evidence supporting the movant's position). This is so even if Detective German was the only officer at the scene who knew before the search that Bogan was a parolee; under the collective knowledge doctrine, a single officer's knowledge that an individual is on parole can be imputed to other officers who participated in the search. *See United States v. Nafzger,* 974 F.2d 906, 912-13 (7th Cir. 1992).

Bogan also claims that Officers Wascher and Busse violated the Fourth Amendment when they used a key taken from the Impala to access common areas of his locked apartment building. Doc. 178 at 5. This claim fails because there is no reasonable expectation of privacy in "shared and common areas in multiple-dwelling residential buildings," even if exterior doors leading to those areas are "locked to exclude persons who are not tenants of the building." *United States v. Sweeney*, 821 F.3d 893, 902-03 (7th Cir. 2016); *see also United States v. Villegas,* 495 F.3d 761, 767-68 (7th Cir. 2007) (holding that there is no reasonable expectation of privacy in an internal common hallway of a two-story duplex dwelling).

For these reasons, Defendants are entitled to summary judgment on Bogan's Fourth Amendment claim arising from the search of his apartment and the common areas of his apartment building, and the corresponding portions of Bogan's cross-motion are denied.

## II.      The Seizure and Search of the Cutlass

Bogan seeks "about ten million" in damages arising from the search of the Cutlass because the search "led to the gun, which led to [his] conviction." Doc. 186-2 at 69:23-70:20. Because Defendants do not invoke *Heck v. Humphrey*, 512 U.S. 477 (1994), as a defense, and because *Heck*

is not jurisdictional, *see Polzin v. Gage*, 636 F.3d 834, 838 (7th Cir. 2011), the court addresses the merits of Bogan's claim that the seizure and search of the Cutlass violated the Fourth Amendment.

A seizure results if "there is some meaningful interference with an individual's possessory interests in that property." *Soldal v. Cook Cnty.*, 506 U.S. 56, 61 (1992). "As a general matter, a warrantless search or seizure is unreasonable unless supported by probable cause, or in the case of an investigatory stop of a vehicle, unless articulable facts support a reasonable suspicion that criminal activity is afoot." *United States v. Griffin*, 652 F.3d 793, 798 (7th Cir. 2011) (internal quotations and citations omitted). Thus, an officer may temporarily seize a vehicle without a warrant if he has probable cause to believe that it "holds contraband or evidence of a crime" and "the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present." *United States v. Burgard*, 675 F.3d 1029, 1032 (7th Cir. 2012). Here, even accepting Bogan's view that the officers thwarted his friend's efforts to drive away the Cutlass before Detective German (who, as noted, was aware at the time that Bogan was a parolee) arrived, probable cause supported the decision to detain the Cutlass.

First, it is undisputed (1) that the JPD circulated an intelligence bulletin indicating that probable cause supported Bogan's arrest for the reported home invasion that had occurred approximately twelve hours earlier and (2) that the officers knew that Bogan was the registered owner of the Cutlass, which was parked outside his apartment building. Although no officer saw Bogan in the Cutlass or knew if he had used it in connection with the home invasion, Bogan was arrested near the Cutlass approximately one minute after Officer Byrne saw the vehicle parked by the apartment building. According to Bogan, immediately after his arrest, he contacted multiple friends and asked them to take the car, and at least one tried and failed. That a friend attempted to

take the Cutlass—which the officers knew was registered to Bogan—minutes after his arrest created even more suspicion justifying a temporary detention of the car. *See Illinois v. McArthur*, 531 U.S. 326, 332 (2001) (observing that the police "reasonably could have concluded that McArthur, … suspecting an imminent search [of his trailer], would, if given the chance, get rid of the drugs fast").

Second, after the apartment search yielded a controlled substance, Detective German questioned Bogan, who denied owning a vehicle other than the Impala. In response to further questions, Bogan denied all knowledge of the Cutlass, but when he was confronted with the fact that he was the registered owner, he admitted that he previously owned the Cutlass, said that he had sold it to "Mike Smith" two weeks earlier, even though it was parked outside his apartment building, and claimed that he could not produce any contact information for "Mike Smith." That provided additional grounds to suspect that the Cutlass contained contraband.

Third, Detective German looked into the Cutlass through a window and saw a closed garment bag that was bulging due to what appeared to be a long object inside. That provided further grounds to suspect that the Cutlass contained contraband. *See United States v. Ruiz*, 785 F.3d 1134, 1141 (7th Cir. 2015) (holding that it was permissible to detain a vehicle parked in a residential driveway because the detention was "based on reasonable suspicion that the detained individual has committed or is about to commit a crime") (citations omitted).

The foregoing grounds—if not individually, then certainly taken together—gave the officers probable cause to detain the Cutlass.

In pressing the contrary result, Bogan contends that Detective German's decision to summon a K-9 officer shows that there was no probable cause prior to the sniff to detain the

Cutlass. But the fact that German thought it prudent to obtain additional support for the warrant application does not does not undermine the probable cause he already had for the search. As the Seventh Circuit has observed, an officer's conduct is not suspicious just because the officer gathers additional information and consults with the prosecutor before performing a search. *See Burgard*, 675 F.3d at 1034. Because the home invasion was tied to an alleged effort to obtain repayment of a heroin debt, Detective German cannot be faulted for playing it safe by obtaining a canine sniff of the Cutlass before applying for a warrant. The fact that an officer decides to obtain a belt does not mean that he was not already wearing a pair of suspenders.

Bogan also contends that the detention of the Cutlass was unreasonable because it took too long to summon the sniffer dog. As the Seventh Circuit has explained: "After seizing an item without a warrant, an officer must make it a priority to secure a search warrant that complies with the Fourth Amendment. This will entail diligent work to present a warrant application to the judicial officer at the earliest reasonable time." *Burgard*, 675 F.3d at 1035.

The delay in conducting a canine search of the Cutlass was not unreasonable. The officers blocked in the Cutlass when they arrived to arrest Bogan a few minutes before 2:00 p.m. After searching Bogan's apartment, Detective German directed Officer Byrne to secure the Cutlass at approximately 3:00 p.m., then left and arrived at the police station at roughly 3:30 p.m. He learned that Officer Van Gessel, the only available K-9 officer at JPD, was on another call. Detective German then contacted other law enforcement authorities to arrange for a K-9 officer, and he also called the Will County State's Attorney's Office. At 4:15 p.m., Detective German called Officer Van Gessel, whose prior call had ended. The officers arrived at the apartment complex at 4:48 p.m., where the dog promptly alerted for the presence of narcotics. (To the

15

extent that Bogan attempts to challenge the reliance on the dog's alert on the ground that no actual drugs were found, the court notes that the police recovered from the Cutlass a blender with white powdery residue, sandwich bags, and a digital scale in a box with a razor blade, scissors, a tooth brush, and a pipe cleaner—which are highly consistent with drug dealing and which almost certainly contained drug residue. *See United States v. Bentley*, 795 F.3d 630, 635-36 (7th Cir. 2015) (noting that the court must consider "the totality of the circumstances," including an alert, an arrestee's statements, physical evidence, and a canine's training and reliability, when considering if a search of a car was constitutional).)

Thus, it took approximately two hours and forty-five minutes for the canine team to arrive after the initial detention of the Cutlass, and only one hour and forty-five minutes after German began to secure a search warrant. Bogan contends that the lapsed time was unreasonable because Detective German did not, in fact, attempt to arrange for an alternative canine officer after learning that Officer Van Gessel was unavailable. As noted, however, the fact that Detective German's incident report and search warrant application do not document an attempt to find other canine units does not create a factual dispute as to whether he placed the calls; Bogan provides no basis to believe that German was required to include this information in the incident report and application or that it was unreasonable for him to have omitted it. Bogan also argues that Defendants did not produce phone records corroborating German's contention that he called three law enforcement agencies and the prosecutor during the time at issue. Doc. 201 at 8. But Bogan did not request phone records in discovery, so Defendants were under no obligation to produce them. *See Eskridge v. Chi. Bd. of Educ.*, 47 F. Supp. 3d 781, 789 n.5 (N.D. Ill. 2014).

16

The Supreme Court has emphasized the importance of making prompt and reasonable efforts to obtain a warrant following a warrantless seizure. *See McArthur,* 531 U.S. at 332-33. Under the present circumstances, the decision to obtain a canine sniff and a lapse of approximately two hours and forty-five minutes from the time of the initial detention is reasonable. Thus, Defendants have carried their burden of showing that the efforts to obtain a warrant were sufficient. *See id.* at 332 (holding that two-hour detention while police secured a search warrant was "for a limited period of time" and "[a]s far as the record reveals, … no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant."). They accordingly are entitled to summary judgment as to Bogan's Fourth Amendment claims regarding the seizure and search of his Cutlass. It necessarily follows that Bogan's request for summary judgment on those claims is denied.

## Conclusion

For the foregoing reasons, Bogan's summary judgment motion is denied and Defendants' summary judgment motion is granted. Judgment will be entered in Defendants' favor.

If Bogan wishes to appeal, he must file a notice of appeal with this court within thirty days from the entry of judgment and pay the $505.00 filing fee. *See* Fed. R. App. P. 4(a)(1). Under Federal Rule of Appellate Procedure 24(a)(1) and 28 U.S.C. § 1915, Bogan may move this court to allow him to proceed *in forma pauperis* on appeal, which will allow him to pay that fee in installments. The fee must be paid regardless of the appeal's outcome; however, if Bogan is successful, he may be able to shift the cost to Defendants. *See* Fed. R. App. P. 39(a)(3); *Thomas v. Zatecky*, 712 F.3d 1004, 1005 (7th Cir. 2013) ("A litigant who proceeds *in forma pauperis* still owes the fees. If he wins, the fees are shifted to the adversary as part of the costs; if he loses, the

fees are payable like any other debt."). If the appeal does not succeed, Bogan could be assessed a "strike" under 28 U.S.C. § 1915(g). If a prisoner accumulates three "strikes" because three federal cases or appeals have been dismissed as frivolous or malicious or for failure to state a claim, the prisoner may not file suit or appeal a judgment in federal court without prepaying the filing fee, unless he is in imminent danger of serious physical injury. *See* 28 U.S.C. § 1915(g).

Bogan need not bring a motion to reconsider this court's ruling to preserve his appellate rights. However, if he wishes the court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). A Rule 59(e) motion must be filed within 28 days of the entry of judgment. *See* Fed. R. Civ. P. 59(e). The time to file a Rule 59(e) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). A Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

September 29, 2017                                    _____
                                                                            United States District Judge